# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **MARCELINO AYALA**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 13 C 3163 |
| | ) |
| **P.O. JOSEPH WALSH #12865**, **P.O.** | ) |
| **MICHAEL KNIGHT #17174**, Individually, | ) |
| and **CITY OF CHICAGO**, a municipal | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Following this Court's February 20, 2015 entry of the parties' jointly submitted proposed final pretrial order ("FPTO") in this ready-for-trial 42 U.S.C. § 1983 ("Section 1983") action,[1] both sides have complied with the timetable for motions in limine established at the meeting that led to the entry of the FPTO: 10 motions on behalf of plaintiff Marcelino Ayala ("Ayala") and 19 on behalf of defendants City of Chicago ("the City") and two of its police officers, Joseph Walsh ("Walsh") and Michael Knight ("Knight") (collectively "Defendant Officers"). With timely responses having been filed by the litigants, the motions are ripe for decision. This memorandum opinion and order will deal first with Ayala's motions and then with defendants' motions.

## Plaintiff Ayala's Motions

No discussion is needed as to a few of plaintiff Ayala's motions: Motion No. 1 [Dkt. 100] has been withdrawn, and defendants offer no objection to Motion No. 2 [Dkt. 93],

---

[1] In addition to Constitution-based Section 1983 claims, the action also asserts state law claims under the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

which seeks to bar defense arguments appealing to jurors' pecuniary interests as taxpayers, and Motion No. 9 [Dkt. 96], which seeks to preclude testimony or other evidence as to the immigration status or country of origin of any witness. Those two motions are therefore granted without objection.

Original Motion Nos. 3 and 7 [Dkt. 98] were amended as of their date of filing by Dkt. 99,[2] but in each instance those motions seek to bar evidence of the arrest records, arrest history and improper convictions of Ayala and other witnesses. As to any prior convictions of Ayala or of witnesses that are older than 10 years, overturned on appeal or were not felony convictions, defendants have agreed not to offer them in evidence. Where the parties part company, however, is as to a single possible exception to their general agreement that prior arrests that did not eventuate in convictions should also be barred.

That possible exception has to do with (1) the arrest of Ayala's grandson Michael Ayala on August 17, 2011 (an arrest that later served as the basis for Michael Ayala's civil rights lawsuit, Ayala v. Bocardo, 11 C 6094) and (2) the arrest that Michael Ayala experienced on the same night Ayala was arrested. Defendants respond with generic arguments that bring to mind Claude Rains' well-known "Round up the usual suspects" line from Casablanca -- to quote defendants' response, "Such evidence is not relevant to Plaintiff's claims, is not probative of any issue in this case, is likely to confuse the jury, and would be orally prejudicial to defendants." Indeed, those arguments have been made the subject of defendants' Motion No. 2 [Dkt. 83].

That position, however, is unduly myopic -- page 3 of Ayala's Motion Nos. 3 and 7 paint a very different and more persuasive picture. Hence Ayala's motion for the admissibility of the

---

[2] Accordingly the Dkt. 98 version of those motions is simply treated as having been withdrawn.

evidence referred to in that portion of Motion Nos. 3 and 7 is granted, although this Court would anticipate giving a carefully crafted jury instruction at trial (after conferring with counsel for the parties, of course) to avoid unfair prejudice (see Fed. R. Evid. 103).

As to Ayala's Motion No. 4 [Dkt. 94], which seeks to bar the introduction of character evidence (past police awards and commendations) as to Defendant Officers, defendants offer a hybrid response [Dkt. 113] that agrees to such a constraint unless defendants' own Motion No. 10 [Dkt. 74] is denied (that motion asks that plaintiff be barred from offering any evidence of prior instances of alleged misconduct by Defendant Officers and by non-defendant Chicago police officers who may be called to testify at trial).

Because the later discussion as to defendants' Motion No. 10 results in a partial grant and partial denial of that motion, under which testimony as to certain prior acts of police misconduct would be admissible in some circumstances, such admissibility would carry with it the admissibility of past police awards and commendations as character evidence proffered to counter arguments as to the officers' lack of credibility. Accordingly the ruling as to Ayala's Motion No. 4 is the flipside of the later ruling as to defendants' Motion No. 10, so that it is granted in part and denied in principal part.

Ayala's Motion No. 5 [Dkt. 95] seeks to bar such characterizations as "high crime areas," "drug areas," "gang areas" and like pejorative labels in referring to the neighborhoods where the incidents at issue occurred. Defendants respond briefly that they "do not intend to illicit [sic -- a Freudian slip?] testimony such as that described in Plaintiff's Motion in Limine No. 5 from the Defendant Officers or any non-defendant Chicago Police Officer who may be called as a witness at trial." But defendants hedge that agreement in this fashion:

However, Defendants do intend to introduce evidence from Plaintiff's witnesses' [sic] regarding their subjective belief about the surrounding area to the extent that these witnesses offered such beliefs as an explanation for their own personal behaviors and actions on May 8, 2012.

That qualification makes it impossible to issue a bright-line ruling at this point. Instead Motion No. 5 is granted in its general form, subject to possible modification by individual rulings that may be called for in the context of the trial itself.

Motion No. 6 [Dkt. 101] asks to bar defendants from using databases -- customarily referred to by their acronyms LEADS and CLEAR -- to determine the criminal history of potential jurors. Defendants respond by agreeing not to use LEADS, but they then propose to use the Chicago Police Department's own system, CLEAR, for that purpose. Although defense counsel say that they "will run the jurors' backgrounds during voir dire and will tender to Plaintiff and the Court results of any pre-voir dire background checks of potential jurors," one major problem with that proposal is its impracticality in the context of this Court's system of jury selection.

As should surprise no one, this is hardly the first time that this Court has dealt with a like proposal by the City -- and has rejected it for just that reason. Because this Court can scarcely be accused of plagiarism for copying its own handiwork, what follows echoes verbatim what this Court wrote in an opinion just over 2-1/2 years ago in response to the City's like motion in another case:

> Although this Court is well aware of the problems that have rarely arisen in this District Court as a result of the nondisclosure by an occasional juror whose voir dire responses have concealed some criminal background, it has never encountered a problem in that respect in its more than three decades on the bench. In law as in life we seldom shape our rules or general practices to respond to such rarely encountered aberrations.

Importantly, this Court's method of jury selection -- one that does not follow the struck jury model, instead conducting voir dire only of prospective jurors as they are seated in the jury box (both the original impaneled set and other persons who are called individually to replace those who are excused for cause or through peremptory challenges) -- would generate a good deal of waste time and effort in obtaining the information piecemeal and providing it to both sides (as is needed to preserve the essential level playing field for the parties).

If a system were to be devised to screen all prospective jurors at the source -- in this District Court's central jury room, before jurors are sent to courtrooms for possible service -- that might both avoid such delays in the courtroom and provide the litigants with that level playing field. This Court might then view the situation differently, but as matters now stand Ayala's Motion No. 6 is granted.

Next (because Motion No. 7 has already been dealt with), Ayala's Motion No. 8 [Dkt. 97] seeks to bar the introduction of evidence that Ayala testified during his deposition that he used the name "Benjamin Martinez" during a 15-year period from 1967 to 1982 in his efforts to obtain work (because he needed a Social Security number to work in this country), so he obtained (by what he said was a loan, not a purchase) a Social Security number from a man from Mexico City.

As defendants would have it, "Plaintiff's use of that alias is directly relevant to Plaintiff's credibility" and "the credibility of a witness is always relevant." That conduct was of course illegal, though perhaps understandable under the circumstances -- but quite apart from what might perhaps be viewed as the mean-spirited nature of defendants' position, to dredge up that ancient history would be an obvious invitation to shoehorn impermissibly into this case the jurors' attitudes about immigrants and our nation's immigration policies, all of which are totally irrelevant to the case at hand -- one of the clearest cases conceivable for an adverse finding of the dangers of unfair prejudice under Fed. R. Evid. 403. Motion No. 8 is granted.

Finally, Motion No. 10 [Dkt. 102] asks that any reference to Ayala's medical history and medical records after August 7, 2012 be barred on grounds of irrelevance and likely jury confusion, pointing to Ayala's disclaimer acknowledging that the claimed attack that forms the gravamen of this action had no causal nexus to Ayala's later hernia operations, nor does Ayala claim that the attack aggravated any pre-existing injuries. Again defendants respond that such evidence of Ayala's medical treatment after August 7, 2012 "is relevant to the evaluation of Plaintiff's credibility as well as for impeachment purposes." That general response is unsatisfactory, for it provides no information to this Court as to the medical records that assertedly "contain information that bear directly upon Plaintiff's truthfulness." Accordingly no current ruling is possible as to Motion No. 10 -- instead the subject is deferred pending further input either before or at trial (preferably, of course, the former).

## **Defendants' Motions**

Just as was said earlier regarding a few of the motions in limine on the other side of the "v." sign, various of defendants' motions in limine -- this time greater in number -- have met with no opposition. Those comprise defendants' Motions Nos. 3 [Dkt. 86] (seeking to bar any testimony or other evidence claiming that Ayala's shunt or catheter was damaged or affected during the incident at issue in this action),[3] 7 [Dkt. 92] (seeking to bar testimony from any witnesses as to any fear they may have felt on the day of Ayala's arrest), 9 [Dkt. 89] (seeking to bar any evidence or argument as to a claimed "Code of Silence"), 11 [Dkt. 75] (seeking to bar evidence or argument as to any general allegations of police misconduct), 12 [Dkt. 76] (seeking to bar any argument that the jury should "send a message" to the City with its verdict), 13

---

[3] That and all other parenthetical designations in the text are necessarily bobtailed. For a full understanding of those defense motions, defense counsel's description should be read.

[Dkt. 78] (seeking to bar any evidence or argument that the City improperly disciplined its police officers), 16 [Dkt. 81] (seeking to bar any evidence or argument that Defendant Officers failed to render aid to Ayala) and 19 [Dkt. 85] (seeking to bar any evidence or argument as to whether either of the Defendant Officers has ever reported to a supervisor or other individual any misconduct witnessed by another officer). All of those motions are accordingly granted, and this opinion goes on to discuss the remaining defense motions.

Motion No. 1 [Dkt. 77] has as an unduly sweeping and truly unjustified scope. It would preclude the introduction of any reference to photographs taken on the key date -- May 8, 2012 -- that allegedly depict bloodstains on the concrete landing from injuries claimed to have been sustained by Ayala's grandson Michael Ayala as a result of alleged excessive force imposed by Chicago police officers. That motion would also seek to bar the testimony of Ayala's son Juan Ayala. But Ayala's response has persuasively linked what those photographs assertedly depict (a matter for jury determination) to Ayala's current case in several respects, and as to Juan Ayala's prospective testimony defendants' motion has missed the point entirely by urging that he was concededly not an occurrence witness -- as Ayala's response states, his son's only role at trial would be to establish the foundation for admission of the photographs into evidence because he was the one who took those pictures on his cellphone (if defendants wish to eliminate him as a witness, they are free to stipulate to the foundation for admissibility purposes). Hence Motion No. 1 is denied.

Motion No. 2 [Dkt. 83] seeks to preclude any evidence as to Michael Ayala's past and present lawsuits against the City and various individual defendants as assertedly not relevant and unduly prejudicial. Ayala offers no objection to portions of that motion: barring reference (1) to the fact that Michael Ayala filed a lawsuit against multiple defendants (including Walsh) or

(2) to Ayala's own previous lawsuits against the City. But Ayala understandably (and quite properly) objects to the rest of the motion, which would preclude reference to prior acts of misconduct allegedly committed by Chicago police officers and described in Michael Ayala's previous lawsuit, for which purpose Ayala explains their relevance to Ayala's own current claims. Accordingly Motion No. 2 is granted in part but is denied in part to allow testimony by Ayala and Michael Ayala as to how the latter was arrested and beaten in Ayala's presence.

Motion No. 4 [Dkt. 87] seeks to bar three named third-party witnesses as to the alleged bloodstains on the concrete steps or landing referred to earlier here in connection with defendants' Motion No. 1. As with that earlier-discussed motion, defense counsel have exhibited an extraordinarily narrow (and quite erroneous) notion of relevance, a view effectively torpedoed by Ayala's brief response [Dkt. 125]. In short, Motion No. 4 is denied.

Motion Nos. 5 [Dkt. 88] and 6 [Dkt. 90] respectively seek to bar the testimony of witnesses Margarita Melgoza and Alejandra Blancas on the grounds that such evidence "is irrelevant and overly prejudicial." Ayala's response [Dkt. 126] interposes no objection to those motions "as long as the defendants do not argue that certain witnesses did not see Michael Ayala while Marcelino Ayala was beaten and arrested." If on the other hand defendants were to point out that certain witnesses did not see Michael Ayala on the scene, Ayala contends that he "should be able to elicit the testimony of Alejandra and Margarita to bolster the credibility of the Plaintiff that he was beaten in the same area and at the same time that Michael Ayala was beaten." That contention makes sense, so that Motion Nos. 5 and 6 are conditionally granted, subject to possible further consideration at trial.

Motion No. 8 [Dkt. 91] seeks to bar any evidence or argument that Defendant Officers violated any internal directive or policy of the City's Police Department (one specific example is

the Department's General Orders on Use of Force).  Defense counsel are of course correct in contending that any such violation would be immaterial in direct terms as to the Section 1983 question regarding the claimed violation of any federal constitutional right (a proposition for which defendants properly advert to multiple decisions by our Court of Appeals and to one or two decisions by the United States Supreme Court on which those rulings rely).  That, however, can be addressed (and any potential for undue prejudice can be blunted) by a jury instruction that allows jurors to consider the violation of such directives and policies as relevant in evaluating an officer's satisfaction of the Fourth Amendment's "reasonableness" standard against which all claims of excessive force are to be judged -- see the seminal opinion in <u>Graham v. Connor</u>, 490 U.S. 386, 393-95 (1989), the case that -- not coincidentally -- defense counsel themselves cite as authority in support of their motion and that provides the constitutional underpinning for the Seventh Circuit opinions cited by defense counsel.  Accordingly Motion No. 8 is denied on the condition stated in this paragraph.

As stated earlier in connection with Ayala's Motion No. 4, defendants' Motion No. 10 [Dkt. 74] seeks to bar any evidence of other alleged misconduct against Defendant Officers and any other testifying officers, including such purported misconduct that had been the subject of other lawsuits.  Ayala's response [Dkt. 130] accedes to that motion with one exception:  As Ayala would have it, reference should be permitted to prior acts of misconduct that Michael Ayala charged in his earlier lawsuit were allegedly committed by officer witnesses Allah Awadallah and Justin Carrillo and by defendant Officer Knight because those acts are assertedly relevant to Ayala's own claims.  Ayala's narrative as to his version of events amply supports the relevance to this action of the just-described evidence that would be encompassed by Motion No. 10.  Accordingly Motion No. 10 is granted in principal part and denied in part.

Motion No. 14 [Dkt. 79] asks to bar any evidence or argument that Defendant Officers will be indemnified by the City if a judgment is entered against Defendant Officers. Defense counsel are rightly concerned lest a jury's awareness of the right to indemnification (more accurately, the guaranty of payment) by the City as to compensatory damages could divert the jury from its proper task of focusing solely on the harm sustained by a plaintiff who they have decided should prevail on the merits, thus perhaps being influenced in the amount of the award by a sense that the City has a "deeper pocket."

But this Court has of course dealt with this situation many times over the years. Unsurprisingly Ayala's response [Dkt. 120] has quoted from an opinion of this Court in <u>Tolliver v. Gonzalez</u>, 2011 WL 5169428, *2 (N.D. Ill. Oct. 31).[4] Here in its entirety is what this Court said on the subject in <u>Tolliver</u>:

> That leaves as a contested matter only defendants' Motion No. 2, which seeks (1) to bar any mention of indemnity by the City of Chicago ("City") and (2) to strike City's name from the case caption. Both facets of that motion stem from an understandable concern that a jury ruling for Tolliver might be inclined to return a verdict awarding excessive damages because of the notion that City's deep pocket is available to satisfy the award.[2]
>
> All of us are familiar with the practice of withholding from juries information about defendants' insurance coverage for just that reason. It must be recognized, though, that such a rule is unrealistic, for example, at least in lawsuits involving motor vehicle accidents because of the pretty much universal knowledge of legally compelled insurance coverage. There clearly is no such public awareness of a municipality's indemnification obligation.
>
> But there is a corresponding danger that a jury, uninformed about any right of indemnification and aware of the comparatively modest income of police officers, could be inclined to lowball a damage award because of that awareness. In this Court's view, arrived at with a good deal of thought over a substantial period of years, the solution that is most fair to both sides is to apprise the jury of City's obligation to make good on compensatory damage awards against its officers, coupled with a

---

[4] That quotation is unsurprising because, by sheer chance, Ayala's counsel also represented plaintiff Tolliver in that Section 1983 lawsuit.

strongly worded cautionary instruction that no consideration of that fact is permitted to enter into the jury's determination of reasonable damages based on the court's customary damages instruction.[3]

_____

[2] In a sense, current events render any such concern unrealistic as to any reasonably well informed person. City's economic woes are widely known, and it is entirely possible that jurors could be less inclined to tap into City's version of Mother Hubbard's Cupboard.

[3] If a plaintiff seeks punitive damages, the jury is always instructed that no such award is permissible against a municipality (City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S. Ct. 2748, 69 L.Ed.2d 616 (1981)). In that situation, it is even more important that the jury be apprised of the different rule as to compensatory damages.

This Court will follow that practice in this case as well, so that Motion No. 14 is denied.

Motion No. 15 [Dkt. 80] is captioned "Bar Any Evidence for Argument Regarding Conspiracy Among Defendants." That has been responded to in part by the absence of any objection by Ayala's counsel to "barring any argument that the Defendants conspired to violate Dkt. 121." But Ayala goes on to object to any contention that Defendant Officers "did not conspire to create false statements, reports, and evidence after the arrest (emphasis added). That distinction is entirely legitimate for the reasons briefly stated in Dkt. 121, so that Motion No. 15 is granted in part and denied in part.

Motion No. 17 [Dkt. 82] seeks to bar any reference to City as a defendant. No reason has been given for such a departure from the actual facts other than defendants' earlier-expressed concern on the "deep pocket" issue already dealt with here in ruling on defendants' Motion No. 14. What this Court said in the earlier-quoted Tolliver case, as set out in its ruling on Motion No. 14, has equal force here. Hence Motion No. 17 is denied.

Finally, Motion No. 18 [Dkt. 84] seeks to bar any argument that would shift the burden of proof to defendants (a perfectly appropriate request, of course), but defendants would go on to "allow argument that Plaintiff did not call certain witnesses at trial in asserting that Plaintiff did

not meet his burden of proof." In that latter respect, defense counsel ignores entirely Instruction 1.18 of the Federal Civil Jury Instructions prepared by the Committee on Pattern Civil Jury Instructions of the Seventh Circuit and given regularly by this Court and its colleagues:

**1.18 ABSENCE OF EVIDENCE**

> The law does not require any party to call as a witness every person who might have knowledge of the facts related to this trial. Similarly, the law does not require any party to present as exhibits all papers and things mentioned during this trial.

That is all of a piece with Instruction 1.19, which deals with possible adverse inferences to be drawn from missing witnesses and as to which the Committee Comments state:

> This instruction should be given only if there is evidence from which the jury could find (1) that the missing witness was physically available only to the party against whom the inference would be drawn, or (2) that the missing witness has a relationship with that party that practically renders the testimony unavailable to that party's adversary.

On that score, as Ayala's counsel has stated in the Response to Motion No. 18 [Dkt. 123]:

> All of Plaintiff's witnesses were made available to and were deposed by the Defendants. Their relationships to the Plaintiff do not make their testimony unavailable to the Defendants. Each witness is also as equally available for trial to the Defendants as they are to the Plaintiffs. In addition, most of the witnesses in essence saw the same event and their stories closely mirror each other, making their testimony "unnecessarily duplicative." Id. Finally, the Plaintiff should not be penalized for making a decision regarding trial strategy in eliminating certain witnesses.
>
> In short, defendants have once again sought to "make the worse appear the better

reason."[5] Motion No. 18 is also denied.

---

[5] John Milton's Paradise Lost, book II line 113, repeating language originally authored by Diogenes Laertius more than 1800 years earlier.

**Scheduling for Trial**

In accordance with this Court's directions given during the meeting that led to the entry of the FPTO (see the Dkt. 71 minute entry), both sides have also sent to this Court's chambers information as to their respective availabilities for trial, with Ayala's counsel also supplementing that information by advising that discussions between counsel for the parties have confirmed that each is available during the week that begins on July 13, 2015. This Court is pleased to confirm that schedule, and it commits itself to keeping that week (and part of the following week, if necessary) to this case. But in light of this opinion's prompt disposition of the parties' motions in limine (something that this Court had not anticipated would be possible in light of the numbers and bulk of those motions), and because of the unanticipated opening up of other trial dates on this Court's calendar, counsel for the parties are advised that this Court would be able to accommodate an earlier trial date if that would mesh with the availability of the parties and their witnesses.[6]

Finally in terms of scheduling, counsels' attention is called to other aspects of the Dkt. 71 minute entry referred to in the preceding paragraph. Those aspects set out the timetable for the preparation and tender of proposed jury instructions and voir dire questions, in anticipation that those submissions will be made available to this Court before the voir dire conference normally scheduled early in the week preceding the week of trial.

---

[6] If such an earlier scheduling were to be satisfactory to both sides in this case, information to that effect should of course be provided to this Court's staff as soon as feasible.

**Conclusion**

This summary conclusion will reduce the rulings announced in this opinion to capsule form, citing to the parties' motions only by their numbers and docket references so as to facilitate their elimination from the list of motions pending in all cases on this Court's calendar.[7] So as to Ayala's motions in limine:

1. Motion No. 1 [Dkt. 100] is withdrawn.

2. Motion Nos. 2 [Dkt. 93] and 9 [Dkt. 96] are granted without objection.

3. Motion Nos. 3 and 7 [Dkt. 99],[8] 6 [Dkt. 101] and 8 [Dkt. 97] are granted.

4. Motion No. 5 [Dkt. 95] is granted subject to possible later modification.

5. Motion No. 4 [Dkt. 94] is granted in part and denied in part.

6. Motion No. 10 [Dkt. 102] is deferred for future determination.

And as to defendants' motions in limine:

1. Motion Nos. 3 [Dkt. 86], 7 [Dkt. 92], 9 [Dkt. 89], 11 [Dkt. 75], 12 [Dkt. 76], 13 [Dkt. 78], 16 [Dkt. 81] and 19 [Dkt. 85] are granted without objection.

2. Motion Nos. 5 [Dkt. 88] and 6 [Dkt. 90] are granted conditionally, subject to possible further consideration at trial.

3. Motion Nos. 2 [Dkt. 83], 10 [Dkt. 74] and 15 [Dkt. 80] are granted in part and denied in part.

---

[7] This Court perceives no need at this point either to repeat or to attempt to summarize the reasoning that has produced its rulings in this opinion.

[8] Dkt. 98 also addressed Ayala's Motion Nos. 3 and 7, but as stated in the text that filing was superseded (on the same day, March 24, 2015!) by the filing of Dkt. 99. Accordingly Dkt. 98 is treated as having been withdrawn.

4. Motion Nos. 1 [Dkt. 77], 4 [Dkt. 87], 14 [Dkt. 79], 17 [Dkt. 82] and 18 [Dkt. 84] are denied.

5. Motion No. 8 [Dkt. 91] is denied conditionally.

Finally, this opinion has also dealt informationally with several aspects of scheduling of the case for trial -- matters that need not be repeated in the minute entry.

_____
Milton I. Shadur
Senior United States District Judge

Date: May 1, 2015